[No. 15710. Department One. March 20, 1920.]

NORTHWESTERN TITLE INSURANCE COMPANY, *Respondent,* v. H. O. FISHBACK, *State Insurance Commissioner, Appellant.*[1]

INSURANCE (1)—AUTHORITY AND LICENSE TO DO BUSINESS—TITLE INSURANCE—ON PROPERTY OUTSIDE STATE—STATUTES—CONSTRUCTION. A domestic title insurance company may write title insurance on property outside of the state, the policy holders to look only to its general assets; and Rem. Code, § 6059-84, as amended by laws 1919, p. 96, § 1, and Id., §§ 6059-197 and 6059-199, providing for a guarantee fund by deposits in various counties in proportion to their population, was intended for the protection of policies on property in this state.

EVIDENCE (6)—JUDICIAL NOTICE—MANAGEMENT AND CONDUCT OF BUSINESS. The courts may take judicial notice of the fact that the thoroughness of title insurance companies is attested by the small amount of litigation involving title insurance.

Appeal from a judgment of the superior court for Thurston county, Wright, J., entered October 22, 1919, in favor of the plaintiff, restraining the insurance com-

[1]Reported in 188 Pac. 469.

missioner from cancelling an insurance company's license, upon overruling a demurrer to the complaint. Affirmed.

*The Attorney General* and *John H. Dunbar,* for appellant.

*W. H. Winfree* and *Chadwick, McMicken, Ramsey & Rupp,* for respondent.

MACKINTOSH, J. — The state insurance commissioner's appeal presents but one question: Has a domestic title insurance company, under the laws of this state, a right to *write title insurance in this state* on *property situated without the state?*

The legislature of 1911 passed chapter 49 (Laws of 1911, p. 161, ch. 49), known as the Insurance Code, the title of the act being:

"An Act to provide an Insurance Code for the state of Washington, to regulate the organization and government of insurance companies and insurance business, to provide penalties for the violation of the provisions of this act, to provide for an Insurance Commissioner and define his duties, and to repeal all existing laws in relation thereto."

This act was amended by the legislature of 1919 (Laws of 1919, ch. 47) so that the sections with which we are now concerned (Rem. Code, § 6059-84, subd. 4, as amended by § 1, ch. 47, p. 96, Laws of 1919), read:

"No company shall issue contracts of guaranty or title insurance in this state, under class twelve of section 6059-83 [defining title insurance], until and unless it deposit and maintain on deposit through the office of the insurance commissioner, with the state treasurer, a guaranty fund in securities authorized by this act as legal investments for the capital or funds of insurance companies, in amounts as follows:

"(a) In counties having a population of five hundred thousand or more as evidenced by the last official

census of the United States or of the State of Washington, the guaranty fund shall not be less than two hundred thousand dollars ($200,000) ; (b) In counties having a population of not less than three hundred thousand nor more than five hundred thousand as evidenced by said census, the guaranty fund shall not be less than one hundred and fifty thousand ($150,000) ; (c) In counties having a population of not less than one hundred and fifty thousand nor more than three hundred thousand, as evidenced by said census, the guaranty fund shall not be less than one hundred thousand dollars ($100,000) ; (d) In counties having a population of not less than one hundred thousand nor more than one hundred and fifty thousand, as evidenced by the said census, the guaranty fund shall not be less than seventy-five thousand dollars ($75,000) ; (e) In counties having a population of not less than sixty thousand nor more than one hundred thousand, as evidenced by said census, the guaranty fund shall be not less than fifty thousand dollars ($50,000) ; (f) In counties having a population of not less than thirty-five thousand nor more than sixty thousand, as evidenced by said census, the guaranty fund shall not be less than twenty-five thousand dollars [$25,000] ; (g) In counties having a population of not less than fifteen thousand nor more than thirty-five thousand, as evidenced by said census, the guaranty fund shall be not less than fifteen thousand dollars ($15,000) ; (h) And in counties having a population of less than fifteen thousand as evidenced by said census, the guaranty fund shall be not less than ten thousand dollars ($10,000). Any company authorized to issue contracts of guaranty, or title insurance in any county of this state shall be permitted and authorized to issue contracts of guaranty and title insurance in one or more other counties of this state: *Provided,* Its guaranty fund on deposit with the state treasurer is equal to the maximum amount hereinbefore required of a company issuing contracts of guaranty or title insurance in any of such counties: *Provided, further,* If any company shall have complied or shall thereafter comply with the provisions of this act for the county in which it has its

principal place of business no other company author-
ized to issue contracts of guaranty or title insurance
in any other county of this state shall be permitted to
issue contracts of guaranty or title insurance therein
after the expiration of its certificate of authority then
held unless it has deposited or shall thereafter deposit
with the state treasurer through the office of the insur-
ance commissioner, securities in addition to those then
required of such company in the same amount as re-
quired for such county: *Provided, further,* That when
any company authorized to issue contracts of guar-
anty or title insurance in any county of the state shall
have and maintain on deposit with the state treasurer,
a guaranty fund in securities authorized by this act
in the total amount of two hundred thousand dollars
($200,000), such company shall be permitted and
authorized to issue contracts of guaranty and title in-
surance in all of the counties of this state: *Provided,
further,* That nothing herein contained shall prevent
any company authorized to issue contracts of guaranty
or title insurance in any county of this state from un-
derwriting or re-insuring in whole or in part contracts
of guaranty or title insurance by any other company.
The provisions of this act shall in no wise be inter-
preted to apply to persons, co-partnerships or corpo-
rations engaged in the business of preparing and
issuing abstracts of, but not guaranteeing or insuring,
title to property and certifying to the correctness
thereof.''

Section 6059-197, Rem. Code, reads:

''Every domestic or foreign company organized for
the purpose of insurance or guaranteeing the owners
or encumbrancers of property within this state against
loss by reason of any incorrect statement in the guar-
anteed certificate of title or policy of title insurance,
or other guaranty of title, issued thereon, or by reason
of any unexcepted lien or encumbrance upon, or de-
fect in the title thereto, shall from and after the tak-
ing effect of this act and before issuing any guaran-
teed certificate of title, or policy of title insurance, or

other guaranty of title, deposit with the state treasurer, as a guaranty fund, securities to the amount specified in this act and of the character hereinafter set forth: *Provided,* That every such company must, before it may issue any policy of title insurance or guaranteed certificates of title, and for so long a time as it may continue to issue any policies of title insurance or guaranteed certificates of title, own and maintain a complete set of tract indexes of the county in which its principal office within this state is located.''

Section 6059-199, Rem. Code, subd. 3, reads:

''If, pursuant to liability on a guaranteed certificate of title, or policy of title insurance or other guaranty of title to property, a judgment shall be entered in a court of general jurisdiction in this state against a company which has made a deposit of securities with the state treasurer subject to the provisions of this act and such judgment shall have become final either by failure to appeal, dismissal of appeal, or by affirmance on appeal, or otherwise, and such judgment shall not be paid and satisfied in full within thirty days after the finality of said judgment has become fixed, then in every such case said judgment may be enforced against said securities so deposited with the state treasurer upon petition of the judgment creditor in the same cause wherein judgment was obtained, setting forth the facts aforesaid, whereupon it shall be the duty of the court wherein said judgment is entered to direct the issuance of a special execution directed to the sheriff of the county in which the capital of the state is situated, which execution shall be as near as may be in the usual form and shall require on the part of said sheriff, the sale of said securities or so much thereof as may be necessary to the satisfaction of said judgment. When application is made for the issuance of said special execution herein provided for, and the court allows the same, the order in which said special execution is authorized, shall direct that service of a copy of the said judgment and the said petition shall be made within five days thereafter upon the state treasurer. All proceedings relating to the enforce-

ment of said writ of execution against said securities
shall conform as near as may be to the practice in
ordinary cases except as herein otherwise specially
provided. Proceedings under said execution shall be
a sufficient authority where notices aforesaid have been
served on said state treasurer for the delivery by said
state treasurer to the sheriff of the securities to be
sold upon execution.''

The insurance commissioner claims that, under these
sections, title insurance companies, of which the re-
spondent is one, cannot write title insurance in this
state on property located without the state.

The first section quoted presents no restriction upon
the title insurance companies as to the situs of the
property the title of which is insured, the section pro-
viding that no company shall issue title insurance un-
til it has made the proper deposit. Then follows the
provision that the deposits in the various counties
shall be in proportion to their population; then the
further provision that any company authorized to
issue contracts of guarantee of title in any county of
the state shall be permitted to issue contracts of title
insurance in any one or more other counties of the
state; and, further, ''nothing herein contained shall
prevent any company authorized to issue contracts of
guarantee or title insurance from underwriting or re-
insuring, in whole or in part, contracts of title insur-
ance by any other company.'' The second section
provides that every domestic company organized for
the purpose of insuring ''the owners or encumbrancers
of property within the state against loss by reason
of defective title shall deposit a guarantee fund.'' It
would seem from a literal reading of this section to be
somewhat inconsistent with the language of the first
section quoted. The third section provides that any
judgment obtained in a court of this state against a
company which has made a deposit of security may be

collected from such deposit. By its language, this section would seem to include judgments upon policies written in this state on property located without the state.

At the time the insurance code was passed, title insurance companies included in their business (1) the writing in this state of policies on the title "of property within the state"; (2) the writing in other states of policies on title to property in such other states; (3) the writing of policies within the state on property situated without the state. The charter of the respondent is broad enough to permit the transaction of all three classes of business, provided the sections we have quoted do not interfere therewith. It is not the policy of the law to interfere with legitimate and established business, but to create additional safety for policy holders. It is not contended that, under the act, domestic companies are prevented from writing policies without the state on property located without the state, nor that the deposits required by the act are made for the protection of such policy holders. The protection afforded by the deposits was to accrue to the benefit of property located within the state, leaving foreign policy holders holding policies upon foreign property to look to the general assets of the company in case of the company's liability being established on such policies. Similar deposits required of insurance companies engaged in other lines of insurance business have been uniformly held to be for similar protection.

The appellant argues that the fact that deposits are to be made in the various counties according to population is conclusive that it was not the intention of the act to allow the company, by making small deposits in one of the smaller counties, to be then entitled to engage in a large business of insurance on titles with-

out the state. This argument is not persuasive, for
the reason that the law provides that, by making a
deposit in any county, the company may write insur-
ance in other counties of the state, and further pro-
vides that the companies may underwrite or reinsure
contracts of other companies; thus clearly indicating
that it was not the intention that the small guarantee
fund was to be security for all the business which the
company might engage in under that guarantee. It
is to be presumed that, when a domestic insurance com-
pany goes into a foreign state and writes insurance on
property in that state, the laws of such foreign state
will be ample to protect the policy holders there. It
must also be presumed that the legislative intent was
that, upon policies written within the state on prop-
erty outside the state, such policy holders were to look
to the general assets of the company for the satisfac-
tion of their claims, and not to the specific deposits
made for the protection of title to property within the
state.

The inconsistencies of the act may be reconciled and
existing and legitimate business be allowed to con-
tinue by a construction which appears logical and in
no way interferes with the purpose of the act and the
protection which it was intended to afford. Such a
construction is that domestic title insurance companies,
before they are permitted to write title insurance in
this state upon property within the state, must deposit
in the manner provided by the statute, and that such
deposits are security for the satisfaction of such lia-
bility assumed by the companies; that domestic title
insurance companies may write, without the state,
policies of insurance on property without the state in
conformity with the laws of such other states, and that
the liability of the companies on those policies is not
to be satisfied out of the deposits made in this state,

and that domestic insurance companies may, within the state, write policies on property without the state, and that the deposits made in this state are not available to such policy holders in satisfaction of the companies' liability thereon, but that such policy holders must look to the general assets of the company for the satisfaction of their claims.    In other words, the method of collection from the guarantee deposit, as provided in the third section which we have quoted, is applicable only to judgments procured in the courts of this state affecting title on policies written within this state and on property within this state.    This is in harmony with the provisions relating to the amount of the deposits in the various counties, the relation of the deposit to the population of the county being an indication that the legislature recognized that the value of the property insured in the various counties would bear direct relation to the population thereof.    To construe this statute in any other way would be to unreasonably hamper the activities of a legitimate business, there being nothing in the character of the business which is inherently vicious or affects the public in any way different from that of other lines of insurance, and the court may take judicial notice of the fact observed by Vance on Insurance, page 590:

"The thoroughness which characterizes the work of these companies [title insurance] is attested by the remarkably small number of cases involving title insurance that are to be found in the reports."

We are establishing the rule as recognized in 22 Cyc. 1388, 1389, that where a statute requires a deposit to be made with a designated officer of the state, by an insurance company for the protection of claims under its policies, such deposit constitutes a trust fund for the protection of the claims of those for whose protection it is intended.

As was said by the supreme court of Mississippi, in *Piedmont & Arlington Life Ins. Co. v. Wallin,* 58 Miss. 1:

"The manifest object of art. 8, of chap. 55 of the Revised Code of 1871 seems to be to organize a scheme by which foreign insurance companies seeking to do business in this state shall appoint their local agents here in the mode prescribed by the statute, and protect the policies issued to our citizens by these agents by making with the state treasurer, a deposit of securities to meet the losses on such policies. It thus makes them *quasi* home companies as to the business done here, and it is this business and those of our citizens who avail themselves of the scheme devised that are protected by the deposit. If a citizen of this state, passing by this provision organized for his benefit, chooses to go elsewhere and effect his insurance, he must be considered as electing to look rather to the general assets of the company than to the special fund held here for the benefit of the home business. Sect. 1080 of the Code of 1880 in plain terms declares that the securities deposited shall be applied to 'all losses incurred on any policy issued by said company in this state to any of its citizens.' This, we think, only makes plain what was less clearly expressed in the Code of 1871."

In *Relfe v. Columbia Life Ins. Co.,* 10 Mo. App. 150, it is said:

"That the $100,000 deposited by a life-insurance company with the superintendent of the insurance department, under the statutory provisions above cited, is a trust-fund for the benefit of the policy-holders of the company making such deposit, seems to be clear. Section 21 speaks of the deposit as made 'for the security' of the policy-holders of the company making the deposit. In section 34 of the act, the deposit to be made by foreign companies spoken of in section 33 as being 'for the security of the policy-holders' is referred to as being 'held in trust and on deposit for the benefit of the policy-holders of such company.' There can be no mistake as to the legislative intent. There

are words sufficient to raise a trust; there is a definite subject, and a certain ascertained object, of the trust. We do not see what is wanting to give an equitable interest in this special deposit to the policy-holders of the company making it. The law seems to separate the fund from the general assets of the corporation making the deposit, and to set apart this fund specially for the security of the policy-holders of that company.''

In *Firemen's Ins. Co. v. Hemingway,* Fed. Case No. 4,797, we find:

''These statutes form a scheme to a certain end, and must be construed together. That end is to give to insurance companies chartered and doing business in other states an opportunity to establish agencies and do business in this state; but as a protection to our citizens from fictitious or insolvent companies created and doing business in other states, and to give to our citizens an opportunity to examine the law of their creation and their condition in every way, the sworn statement of their condition by their principal officers, with a copy of their charter, is required to be filed with the auditor, and also in the office of the chancery clerk in each county in which the companies by their agents may desire to do business, and where liabilities may be incurred upon policies issued through such agents, that the companies may be sued, judgment obtained, and satisfaction had without the policy holder having to go out of the state to obtain it; hence the agreement for service of process, and the deposit to be made with the treasurer, and the mode of reaching the funds so deposited with him; and that those taking risks may know the amount of the risks for which the deposit is liable. In other words, it is to give as far as possible these foreign insurance companies the privileges, coupled with the liabilities, of companies chartered in this state. Such being the case, the deposit is intended only for those who may obtain their policies through the agents appointed and doing business in the state, and under the provisions of our statutes.''

The action of the lower court in overruling the demurrer to the respondent's complaint asking that the

state insurance commissioner be restrained from cancelling its license was correct, and the appellant having refused to plead further, the judgment entered below granting the respondent the relief prayed for is hereby affirmed.

HOLCOMB, C. J., PARKER, MAIN, and MITCHELL, JJ., concur.